IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 00-cv-02325-MSK-MEH

SIERRA CLUB and
MINERAL POLICY CENTER,

      Plaintiffs,

v.

CRIPPLE CREEK AND VICTOR GOLD MINING COMPANY,
ANGLOGOLD ASHANTI (COLORADO) CORPORATION,
ANGLOGOLD ASHANTI NORTH AMERICA, INC., and
GOLDEN CYCLE GOLD CORPORATION,

      Defendants,

and

Civil Action No. 01-cv-02307-MSK-MEH

SIERRA CLUB, and
MINERAL POLICY CENTER,

      Plaintiffs,

v.

CRIPPLE CREEK & VICTOR GOLD MINING COMPANY,
ANGLOGOLD (COLORADO) CORPORATION,
ANGLOGOLD NORTH AMERICA, INC., and
GOLDEN CYCLE GOLD CORPORATION,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

THIS MATTER came before the Court for a 7-day bench trial between February 13 and

22, 2006.  Based upon the evidence presented at trial,[1] the oral and written arguments of counsel, and the facts stipulated to by the parties, the Court finds and concludes as follows.

## I.  Introduction

The Plaintiffs, Sierra Club and Mineral Policy Center, allege that the Defendants, Cripple Creek & Victor Gold Mining Company, Anglogold (Colorado) Corporation, Anglogold North America Inc., and Golden Cycle Gold Corporation, have violated the Clean Water Act, 33 U.S.C. § 1251, *et seq.*, through the discharge of pollutants into the waters of the United States.[2]  The Defendants deny that they have violated the Clean Water Act and challenge the Plaintiffs' standing to pursue such claims.  The Court bifurcated the case into liability and remedy phases. This trial was limited to issues of liability.

---

[1] At trial, the Court received the following exhibits: 1 (from 4:44 through 6:03), 2, 3, 4 (for a limited purpose), 5, 20, 21, 23, 31, 34, 51, 56 (#2072-2074, as a statement of the law), 57, 65 (for a limited purpose), 71 (#2203-2212, for a limited purpose, and #2221-2246), 73, 80, 95, 97 (#3033-3035, 3038-3043, 3055, 3056, 3057-3059, 3061-3062, 3076-3078, 3080-3082, 3087-3089, 3096-3099, 3101-3103, 3105-3107, 3109-3111, 3114-3117), 100 (#3172-3173), 106, 112 (#3266-3278), 120, 129, 130, 132, 137 (excluding alkalinity data on # 3502-3503), 143 (#3548-3551, 3558-3559, 3561-3563, 3565), 149, 150, 155, 172, 176, 183, 186, 187, 188, 190, 196 (#4042, 4068 & 4069, for a limited purpose), 199, 200, 201, 202, 206, 212, 213, 214 (#4214), 215, 216, 218, 223, 224, 226, 227, 230, 235 (#4366 & 4368), 237, 238 (#4451-4457, for a limited purpose), 239, 243 (last page and #4473), 247 (#4492, 4489 & 4490), 248 (#4511), 252, 253, 278, 280, 289, 290, 291 (#4799-4801, 4803-4804 & 4807-4808), 294, 295, 299, 301, 302, 304, 305, 320, 342, 346 (for a limited purpose), 347 (for a limited purpose), 367, 373, 378, 380, 385, 395 (#6201), 402, 412, 417, 420, 421, 422, 423, 500, 502, 503, 507, 509, 510, 511, 512, 513, 514, 515, 516, 518, 520, 521, 528, 530, 531, 532, 533, 535, 536, 543, 546, 551, 561, 562 (page 2), 564, 565, 580, 583, 585, 586, 592 (for a limited purpose), 593, 595, 596, 603, 606 (for a limited purpose), 616 (for a limited purpose), 617 (for a limited purpose).

The Court also conditionally received several exhibits, stating that such exhibits would not be considered if not referenced during the presentation of evidence or in the parties' arguments.  The Court disregards the following conditionally admitted exhibits not referenced by the parties, as irrelevant: 32, 33, 63, 76, 81 (page 3), 93, 121, 173, 182, 189, 217, 221, 222, 228, 240, 246, 254, 279, 282, 291 (#4805, 4806 & 4809), 300, 379, 381, 405, 506, 522 (#533 through 567), 529, 534, 539, 541, 544, 549, 550, 553, 555, 570, 571, 572, 574, 575, 587, 594, 597, 598 and 600.

[2] To the extent practicable, each party is referred to by name.  Otherwise, they are collectively referred to as "the Plaintiffs" or "the Defendants."

## II.  Findings of Fact

### A.  The Parties

#### <u>The Plaintiffs</u>

The Sierra Club is a non-profit corporation which asserts claims on behalf of its members.
Members pay membership dues, are invited to social and educational events and other meetings,
and receive a newsletter and a national publication.  Members have the right to elect and serve as
officers and directors.  According to its bylaws, the Sierra Club's purposes are: "[t]o explore,
enjoy, and protect the wild places of the Earth; . . . and to use all lawful means to carry out these
objectives."

The Mineral Policy Center is also a non-profit corporation which asserts claims on behalf
of its members, however, the Mineral Policy Center's Articles of Incorporation state: "The
Corporation shall have no members."  Its bylaws allow for individuals and entities who make
financial donations to be called "members," but the bylaws also state: "Such so-called members
shall not be entitled to vote or to participate in the management of the Corporation's affairs."  So-
called "members" do not have the right to elect or serve as officers and directors, and they
exercise no control over the Mineral Policy Center.  According to the Mineral Policy Center's
Articles of Incorporation, none of its stated purposes is to protect the environment from
environmental pollutants released from mining activities.  Rather, its purposes include conducting
research, serving as a clearinghouse for information, sponsoring educational activities, and the
like.

Marilyn Fay has been a member of the Sierra Club since 1998 and began paying dues to
the Mineral Policy Center in October 2000.  She has lived in Victor, Colorado since 1970.  For

several decades, Ms. Fay has recreated in the watershed areas off of Shelf Road near Cripple

Creek and Victor, Colorado.  Based upon her belief that the Defendants discharged pollutants into

the watersheds, Cripple Creek and Fourmile Creek, either without a permit or in excess of one,

she has altered her use of these areas.   She is concerned about the water flows because she does

not know what they might contain that could endanger humans, wildlife and the environment.

Kirby Brian Hughes has been a member of the Sierra Club since the early 1990's and

serves as an officer.  He also considers himself to be a member of the Mineral Policy Center.  He

lives in Colorado Springs.  Mr. Hughes also has enjoyed recreation in the watershed area off of

Shelf Road since the 1970's.  Based upon his belief that the Defendants are discharging heavy

metals into Fourmile Creek and Cripple Creek, Mr. Hughes has altered his use of these areas.

### The Defendants

Since at least September 1995, the Cripple Creek & Victor Gold Mining Company

("CC&V") has owned and operated the Cresson Project, a gold and silver mining operation

located within the Cripple Creek Mining District in Teller County, Colorado, near the towns of

Cripple Creek and Victor.  Most of the Cresson Project is located within the mineral-rich diatreme

of an extinct volcano.  CC&V currently conducts mining-related activities of the Cresson Project

in Arequa Gulch and Squaw Gulch.  Its operations are limited to surface mining.

CC&V is a joint venture between AngloGold (Colorado) Corporation ("AngloGold

Colorado") and the Golden Cycle Gold Corporation ("GCG Corporation").  AngloGold Colorado

is a wholly owned subsidiary of AngloGold Ashanti North America, Inc. ("AngloGold N.A.").

Pursuant to a Joint Venture Agreement, AngloGold Colorado acts as the manager of CC&V.

AngloGold N.A. provides legal and land acquisition assistance to AngloGold Colorado but does

not partake in management of the joint venture. GCG Corporation is the joint venture's minority

shareholder and has not participated in its management.

## B. Nature of the Case

This case consolidates two actions. Both were initiated as citizen actions pursuant to the

Clean Water Act, 33 U.S.C. § 1365(a)(1), on November 27, 2000 and November 30, 2001,

respectively. The Plaintiffs assert two types of claims. First, they allege that the Defendants

violated the terms of two separate National Pollutant Discharge Elimination System ("NPDES")

equivalent discharge permits. Second, they allege that the Defendants have discharged pollutants

from various point sources without a permit.

The Colorado Department of Public Health and Environment Water Quality Control

Division ("WQCD") issued two NPDES-equivalent permits to CC&V that are at issue, here. The

Carlton Tunnel permit was issued on March 12, 1992,[3] and, the Arequa Gulch permit was issued

on October 11, 1996.[4]

The Plaintiffs' claims are premised upon events that occurred between May 1994 and June

1999, and in 2004, at six locations within the Cripple Creek Mining District: the Carlton Tunnel

area, Arequa Gulch, the Roosevelt Tunnel Area, the Moffat Tunnel area, the Moffat Tunnel

Cribbing Wall, and Squaw Gulch. These areas are all located near Shelf Road (County Road 88),

an unpaved scenic byway which bisects the Cripple Creek Mining District. At these locations,

water flows into either Cripple Creek or Fourmile Creek, which water ultimately flows into the

---

[3] Permit No. CO-0024562.

[4] Permit No. CO-0043648. This permit is occasionally described in the exhibits as the Cresson Project permit.

Arkansas River, an interstate waterway.

## C. Enforcement Proceedings

While these cases were pending, the EPA and WQCD initiated and concluded enforcement actions against the Defendants which addressed most of the violations alleged in this case.[5]  On April 2, 2001, the Environmental Protection Agency ("EPA") issued a Notice of Violation to CC&V, AngloGold Colorado and GCG Corporation for alleged violations of the two permits.  The Notice also alleged that CC&V, AngloGold Colorado and CGC Corporation discharged pollutants without a permit from the Carlton Tunnel Ponds and the Roosevelt Tunnel.  Based upon this Notice, the EPA commenced an administrative enforcement action for the purpose of recovering a civil penalty, and the WQCD commenced an enforcement action to obtain compliance with the Clean Water Act and permit requirements.[6]

---

[5] The enforcement actions did not address non-permit discharges from the Squaw Gulch Pond and Moffat Tunnel Cribbing Wall.  They also did not address exceedances of the Arequa Gulch permit's effluent limits for cyanide (daily maximum), pH, aluminum, cadmium, manganese, or zinc (daily maximum).

[6] As is more fully discussed in this Court's summary judgment ruling (**#164**), the Clean Water Act gives citizens or citizen groups the right to initiate civil actions when the regulatory agency has not initiated enforcement.  The purpose of a citizen action is to supplement, not supplant, governmental enforcement actions.  *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 60 (1987).  But the Clean Water Act does not address the circumstances presented here – where a citizen action triggers a regulatory enforcement proceeding that results in both an injunction and imposition of a monetary penalty, but the citizen action nevertheless proceeds.

The Court previously ruled that the Combined Complaint and Consent Agreement and the Administrative Order on Consent were not determinative of the issues in this action.  Such conclusion was premised on the fact that the settlement documents in the enforcement action did not contain any factual admissions and on the language of the Clean Water Act that allows the remedies in a citizen action to exceed those available in an administrative action.  However, it leads to a curiosity of the citizen action continuing after the administrative action is concluded.

The scenario of the citizen action continuing after conclusion of the regulatory enforcement proceeding potentially leads to unnecessary litigation and inconsistent outcomes.  From a substantive perspective, when administrative enforcement actions culminate in the imposition of a civil penalty and

(continued...)

In September 2002, the enforcement actions culminated in separate, contemporaneous settlement agreements. Each refers to the other. Neither contains any factual admissions. The settlement agreements allow CC&V to reserve the right to challenge whether a permit was required for the water flowing below the Carlton Tunnel ponds or through Outfall 001A into Arequa Gulch.

The EPA, CC&V, Anglogold Colorado and GCG Corporation entered into a Consent Agreement which required payment of a $125,000 civil penalty, the maximum civil penalty which the EPA could obtain by statute. *See* 33 U.S.C. § 1319(g)(2)(B).[7] The WQCD, CC&V, AngloGold Colorado and GCG Corporation entered into an Administrative Order on Consent which required various actions be taken to ensure compliance with the Clean Water Act.[8]

---

[6](...continued)
injunctive relief, there is a *de minimis* benefit to the continued pursuit of a citizen action. More importantly, however, pursuit of a citizen action after administrative enforcement potentially subjects a polluter to two proceedings with duplicative costs and potentially different outcomes. In essence, the continuing citizen action challenges the adequacy of the administrative enforcement. That being the case, perhaps the correct defendant should be the regulatory agency. If that is not the purpose of allowing the citizen action to continue after completion of the administrative enforcement proceeding, it would be more sensible to allow the enforcement agency to step into the shoes of a citizen-plaintiff in order to eliminate duplicative actions and to maximize the incentive for a regulatory agency to vigorously prosecute violations.

[7] Applicable regulations allow the EPA to recover a penalty of up to $137,500 for violations occurring after January 30, 1997. 40 C.F.R. §§ 19.2 & 19.4. In contrast, there is no statutory cap on the amount of civil penalty recoverable in a citizen action.

[8] For instance, the Administrative Order on Consent required CC&V to apply for a permit for water observed flowing below the Carlton Tunnel ponds, which it subsequently did in June, 2003. A new discharge permit (Permit No. CO-0046540) took effect on April 1, 2006. It authorizes discharges for this water flow.

### D.  Carlton Tunnel

The Carlton Tunnel is a man-made tunnel completed in the early 1940's for the purpose of draining the regional ground water aquifer underlying the Cripple Creek Mining District and surrounding areas. Water flows from the Carlton Tunnel portal[9] into a channel known as a "transmittal trough." From there, it flows either into Outfall 001 or into one of five man-made settling ponds which rest upon a rock pile called the "waste rock dump." Outfall 001 is a culvert that allows water to bypass the settling ponds and flow directly into Fourmile Creek. The purpose of the settling ponds is to assist in the removal of suspended solids from the water before it enters Fourmile Creek. The water that passes through the settling ponds flows through a flume constituting Outfall 002. From Outfall 002, the water flows into a culvert, then into another channel, then down to a county road into other culverts, and finally into Fourmile Creek. CC&V owns the property upon which the Carlton Tunnel portal and settling ponds are located.

### Outfall 002

The Carlton Tunnel permit authorized CC&V to discharge water containing specified levels of pollutants from Carlton Tunnel Outfalls 001 and 002 into Fourmile Creek, and forbade discharges of water containing pollutants from unpermitted point sources. In the section of the Carlton Tunnel permit entitled "Terms and Conditions," the permit prescribed various effluent

---

[9] The parties stipulate that the Carlton Tunnel portal is a "point source" for purposes of the Clean Water Act.

limitations for Outfall 002, as follows:

|  | 30-day Average Limit | 7-day Average Limit | Daily Maximum |
|---|---|---|---|
| Flow | 2.58 MGD |  |  |
| Total Suspended Solids ("TSS") | 30 mg/l | 45 mg/l |  |
| Potentially dissolved zinc | .54 mg/l |  | .60 mg/l |

It also listed "whole effluent toxicity, chronic" as an effluent parameter to be reported, and

characterized this as a "chronic lethality limitation." Under the permit, a Whole Effluent Toxicity

("WET") test was required to determine whether there is an "exceedance" of this limit.[10]

The section of the permit entitled "Monitoring Requirements" required CC&V to conduct

self-monitoring twice per month along with quarterly WET testing. The environmental

department at AngloGold Colorado conducted the required monitoring at the Carlton Tunnel

Outfalls and other permitted discharge locations. AngloGold Colorado's employees collected

surface and ground water from various sites for analysis by a commercial laboratory, which

analyzed the samples for concentrations of particular constituents. The resulting data was

reported to the WQCD and EPA on pre-printed forms called discharge monitoring reports

---

[10] WET testing determines whether there is a "pattern of toxicity" in the water. In WET testing, a water sample is analyzed for a biological response. The species *Ceriodaphnia dubia* and/or Fathead Minnows are added to a water sample. Laboratory technicians then observe whether the species thrives or dies to the same degree as it does in a control sample. If the organisms in the tested sample have different survival rates than in the control sample, then a determination is made as to whether the difference in lethality is statistically significant.

A WET test failure, standing alone, does not demonstrate a pattern of toxicity in the water. Rather, it triggers a requirement to conduct more frequent tests. A pattern of toxicity emerges only if two consecutive WET tests or three of five consecutive tests fail.

("DMRs").[11]

The Carlton Tunnel permit also contains an "upset" provision. It defines an "upset" as "[a]n exceptional incident in which there is unintentional and temporary noncompliance with permit effluent limitations because of factors beyond the reasonable control of the permittee." Excluded from this definition are exceedances "caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventative maintenance, or careless or improper operation."[12]

According to the DMRs and related laboratory reports, between May 1994 and June 1999, the following permit violations occurred at Outfall 002:

(1)     the 30-day average flow was exceeded in May, June and July 1994, July, August, September, October, November and December 1995, January 1996, and June 1999;

(2)     the 30-day average value for potentially dissolved zinc was exceeded in May 1994, June 1994, August 1998 and June 1999;

(3)     the daily maximum value for potentially dissolved zinc was exceeded on September 9, 1998, May 19, 1999, and June 1, 1999.

(4)     the 30-day average concentration for TSS was exceeded in August 1994, December 1995, January 1996, and March 1996; and

(5)     the 7-day average concentration for TSS was exceeded in March and May, 1996;

There were also initial WET test failures in the second quarter of 1996, the first and second quarters of 1997, the third quarter of 1999, the second quarter of 2004, and an unspecified

---

[11] The EPA and WQCD prepared and supplied these forms to AngloGold Colorado. Each form identifies the authorized effluent parameters; the test results are recorded above each parameter.

[12] The permit provides that an "upset" is an affirmative defense to an action for noncompliance with the permit, but the Defendants asserted no such affirmative defense in this action.

quarter in 2005.[13]  However, there is no evidence that a pattern of toxicity ever developed or the "chronic lethality limitation" was ever exceeded.

With regard to the 1999 exceedances, CC&V requested an "upset" determination from the WQCD because between April 1 and August 31, 1999, approximately 20.27 inches of rain fell in the Victor area, which was roughly 106% of the annual average precipitation for that area.  The WQCD agreed that the exceedances at the Carlton Tunnel in May and June of 1999 were caused by an upset condition.

CC&V took several steps to remediate the exceedances identified above and to prepare for future upset conditions.  In 1996, CC&V enlarged the existing four settling ponds and added a fifth pond to address the TSS exceedances.  In August 1998, it removed sediment from the trough to address the TSS and zinc exceedances and WET violations.  In August 2001, CC&V installed baffles in the settling ponds to increase the length of the flow path and therefore the time that the water stayed in the ponds before passing through Outfall 002.  CC&V also conducted testing of Flocculent, a coagulant which had the effect of clumping TSS in the ponds and preventing it from leaving the ponds.  CC&V also implemented aeration testing in an attempt to reduce the discharge of TSS from the ponds.

Since August of 1999, there have been no 30-day flow exceedances at Outfall 002.  Figure

---

[13] The Plaintiffs contend that there were also WET test failures during the fourth quarter of 1992 and the first and fourth quarters of 1993.  However, the evidence they cite for this proposition is inconclusive.

1,[14] which follows, reflects the flow exceedances after January 1995; it does not reflect the three

exceedances which occurred in 1994.  Figure 1 demonstrates that the flow

exceedances after January 1, 1995 were few, minor in degree and non-repetitive.

**Figure 1**
**Carlton Tunnel – Flow (30 day avg)**
**January 1995 to January 2006**



---

[14] Figures 1 through 6 are portions of demonstrative trial exhibits 701, 702, 703, 704 and 706, all of which accurately represent the evidence presented at trial with respect to post-1994 exceedances.  On each Figure, a horizontal line represents the permit effluent limit.  Test results from each DMR are represented by dots along the horizontal axis.  Only those dots appearing above the line represent an exceedance.

Figure 2 below depicts the two 30-day zinc exceedances between January 1995 and

November 27, 2000, the date the Complaint in this action was filed, but it does not reflect the two

exceedances that occurred in 1994.  Figure 2 demonstrates that the exceedances were infrequent,

relatively minor in degree and have not occurred since 1999.  This suggests that the remediation

efforts, although not directed at the zinc exceedances, had a beneficial impact.

**Figure 2**
**Carlton Tunnel – Zinc (30 day avg)**
**January 1995 to January 2006**



Figure 3 depicts the three zinc daily maximum exceedances between January 1995 and November 27, 2000. This figure demonstrates infrequent exceedances.  In addition, although two exceedances are greater in degree than the third, the larger exceedances occurred only in 1998 and 1999, during the same time period as the upset.

**Figure 3**
**Carlton Tunnel – Zinc (Daily Max)**
**January 1995 to January 2006**



14

Figure 4 depicts the three 30-day average TSS exceedances which occurred between January 1995 and November 27, 2000, but it does not reflect the single exceedance in 1994. Considering it with the exceedance in 1994, these exceedances are minor in degree, clustered between August 1994 and March 1996, and did not occur between 1996 and 2000.

**Figure 4**
**Carlton Tunnel – TSS (30 day avg)**
**January 1995 to January 2006**



Figure 5 shows the two 7-day average TSS exceedances which occurred in 1996. Both are minor in degree, and no similar exceedances occurred between 1996 and the filing of the Complaint in this matter.

**Figure 5**
**Carlton Tunnel – TSS (7 day avg)**
**January 1995 to after January 2004**



## Carlton Tunnel Waste Rock Dump

The Carlton Tunnel waste rock dump is located next to the Carlton Tunnel portal. It resembles a hill of rocks believed to have been excavated during the making of the tunnel.

16

Vegetation grows mainly at the base of the dump but also in places along its side.  The five settling ponds are situated on the flat plane located above the waste rock dump.

Several witnesses observed water flowing at the base of the waste rock dump.  Some witnesses described the water as coming from Fourmile Creek springs; others described it as coming from the settling ponds above the dump.  This distinction is critical, however, but there is no direct evidence that addresses the source of the water.

When it added the fifth settling pond in 1996, CC&V emptied and cleaned the original four ponds.  Interestingly, when the ponds were empty, water at the base of the waste rock dump continued to flow, which suggests it flowed, at least in part, from a source other than the ponds.  After the work was completed, CC&V refilled the ponds and the water flow increased.  To eliminate any flow from the ponds, CC&V added bentonite to the ponds.  Thereafter, the flow at the base of the waste rock dump returned to the level it had been before the ponds had been cleaned.

The water at the base of the waste rock dump tested positive for chemical constituents (iron, zinc, aluminum, cobalt and manganese), however, no evidence as to the significance of these results was presented.  No evidence was offered to explain whether or to what degree these minerals occur naturally in water in this location as compared to whether they are in the water as a result of mining or other human activities.[15]

Tests in 2004 of water taken from the flows at the base of the waste rock dump and from the settling ponds revealed differing metal composition.  The water flowing at the base of the

---

[15]  Prior to trial, the Court excluded several opinions offered by the Plaintiffs pursuant to Fed. R. Evid. 702.  None of the excluded opinions addressed whether the chemical constituents in the water obtained from various locations were naturally occurring or were the result of human action.

waste rock dump contained aquatic life; it was clear rather than cloudy or discolored, and did not

leave any orange coloration along its path.  In contrast, the water flowing from the ponds at

Outfall 001A at the end of the five-pond string had no aquatic life, was cloudy and left behind an

orange trail, which is the result of calcite-rich precipitate.

From this circumstantial evidence and in the absence of direct evidence to the contrary, the

Court finds that the water at the base of the waste rock dump did not come from the settling

ponds.

**E.  Arequa Gulch**

Arequa Gulch is a watershed which flows into Cripple Creek.  At Arequa Gulch, CC&V

operates the Valley Leach Facility where it employs cyanide heap leach mining techniques to

extract gold and silver from crushed ore.  Shallow groundwater from underneath the Valley Leach

Facility flows into two underdrains, which are made of 24-inch diameter corrugated plastic

perforated pipe.  This water exits the underdrains into a sediment pond that was constructed in

1995.  The water then flows approximately 300 feet to a flume known as Outfall 001A, where it

exits the sediment pond into Arequa Gulch.  Water passing through Outfall 001A contains

chemical constituents such as arsenic, cadmium, copper, manganese, nickel, zinc, and cyanide.

CC&V owns the property where Outfall 001A and the sediment pond are located.[16]

On October 11, 1996, the WQCD issued the Arequa Gulch permit to CC&V with an

effective date of November 11, 1996, for water flowing from Outfall 001A into Arequa Gulch.  In

the section of the Arequa Gulch permit entitled "Terms and Conditions," the permit prescribed

---

[16] The parties stipulate that Outfall 001A is a "point source" for purposes of the Clean Water Act.

effluent limits for several constituents at Oufall 001A:

|  | 30-day Average Limit | Daily Maximum Limit |
|---|---|---|
| weak acid dissociable cyanide | .021 mg/l[17] | .005 mg/l |
| pH |  | 6.0[18] to 9.0 s.u. |
| potentially dissolved aluminum | .087 mg/l | .750 mg/l |
| potentially dissolved cadmium | .0034 mg/l | .019 mg/l |
| potentially dissolved manganese | 1.0 mg/l |  |
| potentially dissolved zinc | .343 mg/l | .379 mg/l |

Like the Carlton Tunnel permit, the Arequa Gulch permit also listed "whole effluent toxicity,

chronic" as an effluent parameter to be reported and also characterized this as a "chronic lethality"

limitation.  Also like the Carlton Tunnel permit, this permit requires periodic water constituent

monitoring, as well as quarterly WET testing.  An initial WET test failure triggers certain testing

requirements to establish the existence of a pattern of toxicity.  The Arequa Gulch permit also

contains "upset" provisions identical to those in the Carlton Tunnel permit.

On November 6, 1996, prior to the Arequa Gulch permit's effective date, CC&V filed a

petition in the Teller County District Court pursuant to § 25-8-404(4), C.R.S. to stay the permit.

CC&V and the WQCD were the only parties to that action.  They entered into several stipulations

to stay various limits in the permit.  The first stay took effect on November 14, 1996, but its terms

were not made part of the record.  This stay was amended on December 29, 1997 and again on

---

[17] This 30-day average limit was in place until December 31, 1997.  After January 1, 1998, there was no 30-day average limit in the permit.  Except as otherwise noted, all other limits in this table took effect on January 1, 1998.

[18] The lower limit was 6.0 s.u. until December 31, 1997.  Effective January 1, 1998, the lower limit rose to 6.5 s.u.

February 16, 1999 but the amendments also were not submitted in evidence.  The most recent

stipulation, entered into in November 1999, became a court order (hereinafter "Stay Order") on

December 10, 1999.  The Stay Order stayed enforcement of the permit but imposed the following

effluent limits:

|  | 30-day Average Limit | Daily Maximum Limit |
|---|---|---|
| weak acid dissociable cyanide | .021 mg/l | .27 mg/l |
| pH |  | 5.0 s.u. to 9.0 s.u. |
| potentially dissolved aluminum | 22 mg/l | 32 mg/l |
| potentially dissolved cadmium | .017 mg/l | .10 mg/l |
| potentially dissolved manganese | 9.0 mg/l | 12 mg/l |
| potentially dissolved zinc | 1.7 mg/l |  |

The Stay Order also stayed WET testing.  In accordance with the Stay Order, the WQCD

modified the DMRs (which CC&V then completed with testing results) to reflect the effluent

limits as set forth in the Stay Order.

According to subsequent DMRs, there were exceedances of the Stay Order limits.  The

30-day average effluent limit for weak acid dissociable cyanide was exceeded in September 1998

and May, June, July and August 1999.[19]

The Plaintiffs contend that discharges of weak acid dissociable cyanide, pH, potentially

dissolved aluminum, potentially dissolved cadmium, potentially dissolved manganese, and

potentially dissolved zinc at Outfall 001A exceeded the limits of the original permit.  They direct

---

[19] Apparently, an initial WET test failure of Ceriodaphnia dubia occurred in the fourth quarter of 1996, but without having the terms of the first stay before it, the Court cannot determine whether there was an exceedance.  CC&V did not conduct any further WET testing after January 1, 1997.

the Court to the discharge amounts recorded in DMRs submitted between 1996 and 2001, and to field notes.  However, none of these documents identify what discharge exceeded what limit or the date of the occurrence.  The Plaintiffs argued in their written closing arguments that notice letters identify the date and nature of the violations, however such letters were not offered into evidence.  As a consequence, the Court cannot determine that there were exceedances of the original permit limits.

After the failed WET test and cyanide exceedances, CC&V took steps to remediate.  It installed two experimental ponds in September 2000 for the purpose of reducing toxicity, to adjust pH levels, to address the cyanide violations and to remove aluminum and other metals from the water.  CC&V also made upgradient changes, by changing the slope of the road descending into Arequa Gulch to prevent stormwater from flowing over the crest and onto the embankment below.  CC&V also designed and utilized a large, triple-lined storage pond to contain the water. In August 2001, CC&V installed a sediment pond baffle in the storage pond.  The next year, CC&V installed a pump-back system which eliminated all discharge at Outfall 001A.

As Figure 6 demonstrates, during 1998 and 1999, there were five occasions when cyanide exceeded the limit specified in the Stay Order.

**Figure 6**
**Arequa Gulch – Cyanide**
**November 1996 to November 2005**



With regard to these exceedances, CC&V requested an "upset" determination from the WQCD. The WQCD made no formal determination concerning the existence of upset conditions. However, it stated: "the precipitation events in the spring of 1999 were likely to have had a significant influence on the levels of cyanide in the wastewater discharged from outfall 001A to Arequa Gulch and we did not pursue a formal enforcement action regarding the reported exceedances at 001A for May through August 1999 based on that belief." The Court finds that no exceedances occurred after the upset period.

The WQCD issued a new Arequa Gulch permit effective February 1, 2003. The new permit superceded the 1996 Arequa Gulch permit and set new effluent limits. No violation of the new permit has been alleged.

## F. Roosevelt Tunnel

The Roosevelt Tunnel is a lateral man-made underground structure known as an "adit" constructed for the purpose of draining ground water. It extends approximately 5 miles underground, passing under the Valley Leach Facility at Arequa Gulch. None of the Defendants have a permit to discharge pollutants from the Roosevelt Tunnel.

Water flows into the Roosevelt Tunnel from a variety of sources – through vertical shafts, down the tunnel from unknown sources and through the rock forming the roof and sides of the tunnel. Water flows the length of the tunnel as far as inspectors can physically proceed. Water intermittently flows out of the Roosevelt Tunnel at the Roosevelt Tunnel portal, located along Shelf Road. This water flows into a culvert and then into Cripple Creek. No direct evidence was presented which identifies the source of the water that is discharged at the portal, or to the extent

it comes from a number of sources, what chemical constituents are contributed by each source.[20]

The El Paso Shaft is a vertical shaft that joins the Roosevelt Tunnel approximately 2 ½ miles from its portal.  Water has been observed flowing down the El Paso Shaft into the Roosevelt Tunnel.  At one time, AngloGold N.A. conducted exploratory drilling near the El Paso Shaft, but there is no direct evidence that such drilling affected the water flowing from the Roosevelt Tunnel.

Water exiting the Roosevelt Tunnel portal has been tested on several occasions.  The parties stipulated that water exiting the culvert attached to the portal contains "chemical constituents."  On November 16, 2000 and August 7, 2001, water samples tested positive for iron, manganese, zinc and other constituents.  However, as with regard to all other water sample data, no evidence was presented to explain the significance of these test results or from which the Court can determine whether the chemical constituents are naturally occurring or the result of human action.

### G.  Moffat Tunnel

The Moffat Tunnel is also a man-made tunnel that underlies certain properties and mineral interests of CC&V.  This tunnel apparently was constructed between 1895 and 1898 for the purpose of draining water.[21]

The Moffat Tunnel Cribbing Wall, located between the Moffat Tunnel portal and Cripple

---

[20] CC&V holds an unpatented mining claim with regard to the property where the Roosevelt Tunnel portal is located.  The parties agree that the Roosevelt Tunnel portal constitutes a "point source" for purposes of the Clean Water Act.

[21] There is no evidence that water has flowed from the Moffat Tunnel portal in recent years; to the contrary, one witness reported that he has never seen water flowing from the portal.

Creek, is a man-made wall constructed from several 6- to 10-inch diameter interlocking logs. The logs support a pile of rock believed to have been excavated during construction of the tunnel. The Defendants have no permit to discharge pollutants from the Moffat Tunnel Cribbing Wall into Cripple Creek.

On several occasions, water has been observed flowing from beneath the logs of the Moffat Tunnel Cribbing Wall. The water enters a shallow ditch, then flows a short distance along a county road, enters a metal culvert, flows underneath the road, enters a meadow area, then flows into Cripple Creek. No direct evidence as to the origin of the water – whether the water comes from a spring or is the result of water filtering through the rock pile behind the Cribbing Wall - was presented.

Water flowing from under the Cribbing Wall has been tested several times, revealing the presence of chemical constituents including zinc, arsenic, cadmium, copper and manganese. However, as with regard to the other water samples,  no evidence was presented that addresses the significance of these constituents or from which the Court can determine whether they arise naturally or as a result of human activity. In addition, although CC&V has an ownership interest in a parcel of land on which part of the Cribbing Wall is situated, there is no evidence from which the Court can find that the Defendants have an ownership interest in the property from which the water originates or where the flow has been observed.

**H.  Squaw Gulch**

Squaw Gulch is a watershed and a tributary of Cripple Creek. CC&V currently stores

overburden[22] in the upper reaches of Squaw Gulch. The Squaw Gulch Pond is a man-made stock watering pond located near the Squaw Gulch Road approximately one-quarter mile below Highway 67, which runs between Victor and Cripple Creek. The pond was built sometime between 1956 and 1962. CC&V has a property interest in the Squaw Gulch Pond, but it does not use the Squaw Gulch Pond for any purpose. None of the Defendants have a permit to discharge pollutants from the Squaw Gulch Pond into Squaw Gulch.

Water has been observed flowing below the Squaw Gulch Pond into Squaw Gulch, but there is no direct evidence as to the source of the water - from the pond or from some other source. The water below the Squaw Gulch Pond has tested positive for chemical constituents, such as cadmium and zinc, as have water samples from the Squaw Gulch Pond, but as with the other samples, no evidence establishes the significance of the test results nor allows the Court to determine whether the constituents were naturally produced or the result of a human activity.

### III.  Conclusions of Law

**A.  Standing**

The Defendants challenge the standing of the Plaintiffs to bring a citizen suit under the CWA. Standing is a threshold issue, and the Plaintiffs bear the burden of proving standing by a preponderance of the evidence. *See Gilbert v. Shalala*, 45 F.3d 1391, 1394 (10th Cir. 1995).

An organization has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the

---

[22] There was no evidence presented as to the definition of "overburden." However, according to the Merriam-Webster's Collegiate Dictionary (10th Ed. 2001), overburden consists of "material overlying a deposit of useful geological materials or bedrock."

participation of individual members in the lawsuit.  *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181 (2000).  For the individual members to have standing: (1) they must have suffered an "injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury must be fairly traceable to the challenged action of the defendant; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *See id.* at 180-81.

In an environmental case, a plaintiff establishes an injury in fact when he shows that he uses the affected area and that the challenged activity lessens the aesthetic and recreational values of the area.  *See id.* at 183.  The injury must be tied to specific uses of the area.  *See id.* at 183-84.

The Sierra Club has members who would have standing to sue in their own right, and members of the Sierra Club enjoy the perquisites of membership.  Ms. Fay and Mr. Hughes identified specific ways in which they altered their uses of the applicable watersheds or creeks after learning of the alleged discharge of pollutants by the Defendants.  If correct in their beliefs, then their injuries could be redressed by relief requested by the Sierra Club.  The interests at stake in this lawsuit are germane to the Sierra Club's stated purposes and the participation of the Sierra Club's members in this lawsuit is not required.  Therefore, the Sierra Club has standing as a plaintiff in this action.

In contrast, the Mineral Policy Center is a corporation whose Articles of Incorporation prohibit it from having members.  An organization which lacks traditional, voluntary "members" can, in certain circumstances, have standing.  *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 344-45 (1977).  Organizational standing is possible when membership is compulsory (and therefore untraditional) as long as such members "possess all of the indicia of

membership in an organization." *See id.* Such indicia of membership include the election of

officers, the ability to serve as officers, and the ability to finance the organization. *See id.* So-

called "members" of the Mineral Policy Center lack the right to serve as, or elect, officers and

directors, and they exercise no control over the Mineral Policy Center. Although Ms. Fay and

Mr. Hughes consider themselves to be members of the Mineral Policy Center, they do not enjoy

the essential perquisites of membership. Therefore, the Mineral Policy Center lacks standing to

proceed as a plaintiff in this action.

## B. The Clean Water Act

The Clean Water Act was enacted "to restore and maintain the chemical, physical, and

biological integrity of the Nation's waters." 33 U.S.C. § 1251. Consistent with this objective, the

Clean Water Act prohibits unpermitted discharges of pollutants into navigable waters of the

United States. 33 U.S.C. § 1311(a); *Defenders of Wildlife v. U.S. Environmental Protection

Agency*, 415 F.3d 1121, 1123 (10th Cir. 2005). A discharge must be in compliance with an

NPDES or NPDES-equivalent permit issued to the discharging party. 33 U.S.C. § 1342;

*Defenders of Wildlife,* 415 F.3d at 1123. Such permit is issued by the Administrator of the EPA

or by a state agency under an EPA-approved State Pollutant Discharge Elimination System Permit

program. 33 U.S.C. § 1342(b). Colorado has an approved permit program which allows the

WQCD to issue NPDES-equivalent discharge permits, pursuant to the Colorado Water Quality

Control Act. *See* § 25-8-501, C.R.S.

The Clean Water Act allows a citizen to "commence a civil action on his own behalf . . .

against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation

under this chapter or (B) an order issued by the Administrator or a State with respect to such a

28

standard or limitation[.]" 33 U.S.C. § 1365(a)(1).  The definition of an "effluent standard or

limitation" is broad and includes an NPDES "permit or condition thereof[.]" 33 U.S.C. §

1365(f)[23]; *see also* Mark A. Ryan, THE CLEAN WATER ACT HANDBOOK, 261 (2d Ed. 2003).

The Sierra Club asserts fourteen claims in this action.  As to all elements of each claim, it

has the burden of proof by a preponderance of the evidence.  *See, e.g., Coeur D'Alene Tribe v.

Asarco, Inc.*, 280 F. Supp. 2d 1094, 1102 (D. Idaho 2003).

As to all claims, the Court's subject matter jurisdiction depends upon the existence of an

ongoing violation.  The Sierra Club must establish that as of the date of the Complaint, the

violation was ongoing, or there was a continuing likelihood of a recurrence of intermittent or

sporadic violations.  This requirement is derived from the Supreme Court's ruling in *Gwaltney*,

*supra*.  In *Gwaltney*, the Supreme Court interpreted § 505(a)[24] of the Clean Water Act.  The

Supreme Court held that if there are good faith allegations of an ongoing or intermittent violation

at the time a complaint is filed, then a court has subject matter jurisdiction over the claimed

violation.  It reasoned that the Clean Water Act prohibits a citizen from suing for wholly past

violations of the Clean Water Act.

---

[23] Section 1365(f) provides:

> For purposes of this section, the term "effluent standard or limitation
> under this chapter" means (1) effective July 1, 1973, an unlawful act
> under subsection (a) of section 1311 of this title; (2) an effluent limitation
> or other limitation under section 1311 or 1312 of this title; (3) standard of
> performance under section 1316 of this title; (4) prohibition, effluent
> standard or pretreatment standards under section 1317 of this title; (5)
> certification under section 1341 of this title; (6) a permit or condition
> thereof issued under section 1342 of this title, which is in effect under this
> chapter (including a requirement applicable by reason of section 1323 of
> this title); or (7) a regulation under section 1345(d) of this title.

[24] This is 33 U.S.C. § 1365(a).  Such statute explicitly confers jurisdiction upon federal district
courts to order injunctive relief or the payment of a civil penalty for violation of the Clean Water Act.

Although the Supreme Court's ruling was limited to pleading sufficiency, since then, circuits that have addressed the issue have required a plaintiff to prove an ongoing violation in order to establish jurisdiction.  The Fourth Circuit has allowed proof of an ongoing violation in one of two ways -  "either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations."  *See Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.,* 844 F.2d 170, 171-72 (4th Cir. 1988).  Other circuits have since applied this standard in assessing subject matter jurisdiction.  *See Community Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943 (9th Cir. 2002); *Natural Resources Defense Council, Inc. v. Texaco Refining & Marketing, Inc.*, 2 F.3d 493, 501 (3d Cir. 1993); *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.,* 989 F.2d 1305 (2d Cir. 1993).  The Tenth Circuit has discussed *Gwaltney* in various decisions, but has not yet addressed this specific issue.  Because no other standard has been elsewhere adopted, this Court applies that articulated by the Fourth Circuit.

In this case, with one exception, there is no contention that violations continued after the filing of the action.  Thus, the Court must determine whether the violations that occurred before the Complaint was filed were likely to recur.  Such determination is based on the facts that existed at or before the time when the suit commenced.  *See Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.,* 890 F.2d at 693-94; *Connecticut Coastal Fishermen's Ass'n,* 989 F.2d at 1311.  Therefore, the absence of post-complaint violations is not a factor that a court may consider.  A court may, however, consider post-complaint violations, including whether such violations are of the same type and degree as the pre-complaint violations.  *See, e.g., American*

*Canoe Ass'n*, 412 F.3d at 539.[25]   A court may also consider whether a defendant took steps to eradicate the cause of the violation prior to the filing of the complaint.  *See, e.g.*, *Connecticut Coastal Fishermen's Ass'n,* 989 F.2d at 1312.  A court may also consider the extent and degree of historical violations at the site.  *See Henry Bosma Dairy*, 305 F.3d at 954.

## C.  Permit Discharges

The Sierra Club claims violations[26] of the Carlton Tunnel and Arequa Gulch permits, in particular:[27]

- <  Violation of the Carlton Tunnel permit's effluent limitations for flow, TSS and zinc.

- <  Exceedance of the WET limitations in the Carlton Tunnel Permit on at least the following occasions: 2nd Quarter 1996, 1st and 2nd Quarters 1997, 3rd Quarter 1999, and 2nd Quarter 2004.

- <  Exceedance of the WET limitations in the Arequa Gulch Permit for discharges at Arequa Gulch Outfall 001A into Arequa Gulch during the 4th Quarter of 1996.

- <  Failure to comply with the WET testing requirements of the Arequa Gulch Permit at Arequa Gulch Outfall 001A after December 31, 1996.

- <  Exceedance of effluent limitations (.021 mg/l on a 30 day average for Weak Acid Dissociable Cyanide) in the Arequa Gulch Permit for discharges at Arequa Gulch Outfall 001A into Arequa Gulch on at least the following occasions: September 1998, May 1999, June 1999, July 1999, and August 1999.

---

[25] In *Texaco Refining & Marketing, Inc.*, 2 F.3d at 502, the Third Circuit suggests that evidence of one or two post-complaint violations is conclusive of an ongoing violation.  However, the Third Circuit did not address what the specific violations were. Therefore, it is not possible to discern whether the case should be limited to its facts.  This Court declines to adopt an absolutist approach to post-complaint violations.

[26] The Sierra Club also claims a violation of the Carlton Tunnel permit's prohibition against discharging pollutants without a permit.  This is premised upon its contention that if the permit does not authorize a discharge, then any discharge is prohibited.  Thus, such claim is addressed *infra*.

[27] Claims 1(b), 2, 3, 4, 5, 6, 7, 8(a), 8(b), 9 and 12.

> <      Exceedance of the effluent limitations (.005 mg/l on a daily maximum for Weak
>        Acid Dissociable Cyanide, pH, .087 mg/l on a 30 day average and .750 mg/l daily
>        maximum for aluminum, .0034 mg/l on a 30 day average for cadmium,[28] 1.0 mg/l
>        on a 30 day average for manganese, .343 mg/l on a 30 day average and .379 mg/l
>        daily maximum for zinc) in the Arequa Gulch Permit for discharges at Arequa
>        Gulch Outfall 001A into Arequa Gulch on dates specified in the March 6, 2002
>        and January 22, 2005 notice letters.

Assuming violations are ongoing, to prevail on its permit violation claims, Sierra Club must prove

that: (1) a discharge permit was issued to the Defendants; (2) the permit had an effluent limit or

other condition; and either (3) the discharge exceeded the effluent limit, or there was a violation

of the permit condition.[29]

**Carlton Tunnel Permit**

The Sierra Club alleges flow, zinc and TSS effluent limit exceedances at Carlton Tunnel

Outfall 002 in its Complaint filed November 27, 2000.  At such time, there had been no flow or

zinc exceedances for approximately 17 months and no TSS exceedances for 4 ½ years.  The flow

exceedances which occurred were minor and infrequent, as were most of the zinc exceedances.

*See* Figures 1, 2 and 3, *supra*.  The TSS exceedances were also infrequent.  *See* Figures 4 and 5,

*supra*.  The WQCD determined that the 1999 exceedances were the result of excessive rainfall,

not any wrongdoing by CC&V.  Several years prior to the filing of the Complaint, CC&V took

steps to remediate by enlarging the sediment ponds, adding a fifth pond and cleaning the trough.

The remedial  efforts appeared to have been fully successful with regard to the TSS exceedances.

---

[28] In its written closing argument, the Sierra Club expressly abandons its claim that the daily
maximum limit for cadmium was exceeded.

[29] As to all of the permit claims, the Defendants dispute element 1 on legal grounds.  They dispute
element 2 only with respect to the claim that they failed to conduct WET testing.  Otherwise, their
challenge to these claims is premised upon the absence of an ongoing violation.

Therefore, at the time the Sierra Club asserted these claims, the Court concludes that there was no ongoing violation or a likelihood of a recurrence of intermittent or sporadic violations of the flow, zinc or TSS effluent limitations.

As to the alleged WET violations, the evidence shows that there were initial WET test failures in the second quarter of 1996, the first and second quarters of 1997, the third quarter of 1999, the second quarter of 2004, and an unspecified quarter in 2005.  However, these did not mature into a pattern of toxicity nor was there any evidence that single WET test failures constituted an exceedance of the "whole effluent toxicity, chronic" parameter.  Rather, the WET test failures were isolated and there is no evidence to suggest that they were connected.

As noted earlier, an initial WET test failure does not establish chronic lethality.  It simply triggers the obligation for more frequent testing.  Thus, absent consecutive or prevalent failed WET tests, there is no permit violation.[30]  However, even if one were to conclude that a single WET test failure constitutes a violation of the permit, the Court concludes that there has been an insufficient showing of ongoing violations or a likelihood of recurrence.

**Arequa Gulch Permit**

Before the Court can address these claims, there is a threshold issue to determine: the significance of the Teller County District Court action and Stay Order.

-------

[30] This is consistent with the EPA's view on initial WET test failures.  When WET test failures are not consecutive or prevalent, the EPA does not view them to be a problem and recommends against enforcement actions.  According to its policy regarding WET test failures, the "EPA does not recommend that the initial response to a single exceedance of a WET limit, causing no known harm, be a formal enforcement action with a civil penalty."  Instead, when there is a WET exceedance, it recommends conducting a professional review.  The enforcement agency then exercises its discretion in selecting an appropriate response.  The EPA recommends escalating enforcement responses to continuing WET violations.

As noted earlier, CC&V filed a petition in the Teller County District Court pursuant to § 25-8-404, C.R.S., of the Colorado Water Quality Control Act, shortly before the Arequa Gulch permit was to take effect in November 1996.  This statute provides in relevant part:

> (4)(a) Except with respect to emergency orders issued pursuant to section 25-8-307, any person to whom a cease and desist order, clean-up order, or other order has been issued by the division or commission, or against whom an adverse determination has been made, may petition the district court for a stay of the effectiveness of such order or determination. Such petition shall be filed in the district court in which the pollution source affected is located. . . .[31]

Pursuant to a stipulation of the parties, on December 10, 1999, the Teller County District Court ordered a stay of the Arequa Gulch permit subject to new effluent limits.[32]  This stay was in effect until a new permit took effect in 2003.

The Sierra Club argues that the Stay Order is the equivalent of a permit modification made without public notice or an opportunity to comment and therefore is therefore void, as a matter of law.  In support of this argument, it relies upon *Sierra Club v. Young Life Campaign, Inc.*, 176 F. Supp. 2d 1070 (D. Colo. 2001), *United States v. Ohio Edison Company*, 725 F. Supp. 928 (N.D. Ohio 1989), *Student Public Interest Research Group of New Jersey, Inc. v. Monsanto Co.*, 600 F. Supp. 1479 (D.N.J. 1985), *Public Interest Research Group of New Jersey v. Yates Industries, Inc.*, 757 F. Supp. 438,

---

[31] The statute also provides that "[a]ny party may move the court to remand the case to the division or the commission in the interests of justice, for the purpose of adducing additional specified and material evidence, and findings thereon[.]" § 25-8-404(5), C.R.S.   Such provision allows for the matter to be re-routed to the administrative process for further proceedings.  Presumably, further proceedings would have been subject to public notice and comment.  It is not clear why the Sierra Club did not intervene in the action or whether it could have requested such remand.  *See, e.g., Colorado Water Quality Control Comm'n v. Town of Frederick*, 641 P.2d 958, 962 (Colo. 1982) (addressing analogous provision in Administrative Procedure Act and concluding that formal party status is required to obtain judicial review).

[32] Based upon the evidence presented, it appears that there were prior stipulations, the terms of which were not presented.  Thus, the Court cannot determine what specific permit requirements were stayed prior to December 10, 1999.

*reconsidered in part*, 790 F. Supp. 511 (D.N.J. 1991), *Citizens for a Better Environment-California v. Union Oil Co. of California*, 83 F.3d 1111 (9th Cir. 1996), *United States v. Smithfield Foods, Inc.*, 191 F.3d 516 (4th Cir. 1999), *Pennsylvania Public Interest Research Group, Inc. v. P. H. Glatfelter Co.*, 128 F. Supp. 2d 747 (M.D. Pa. 2001), *Culbertson v. Coats American, Inc.,* 913 F. Supp. 1572 (N.D. Ga. 1995), *Public Interest Research Group of New Jersey, Inc. v. New Jersey Expressway Authority*, 822 F. Supp. 174 (D.N.J. 1992), and *Proffitt v. Rohm & Haas*, 850 F.2d 1007 (3d Cir. 1988).

These cases are all civil actions brought under the Clean Water Act either by citizens or the United States claiming violations of an NPDES, or NPDES-equivalent, permit. These opinions address three factual situations: (1) where the state agency or the EPA made a representation, either verbal or written, that it would not enforce a particular permit requirement;[33] (2) where the state agency issued an administrative order suspending a permit

---

[33] In *Young Life Campaign,* the Young Life Campaign moved to dismiss, arguing that the State of Colorado was an indispensable party because the WQCD had written a letter authorizing it to delay compliance with the permit's flow measurement requirements. Another division of this Court ruled that the State of Colorado was not an indispensable party. In its analysis, the court stated in *dicta* that the WQCD's letter did not modify the terms and conditions of the permit and that the Young Life Campaign had an absolute duty to comply with its permit.

In *Ohio Edison Company*, the permit-holder argued that it could not be liable because the state EPA had written two letters which relieved them of the permit's requirement to construct a cooling tower. The district court concluded that the letters did not modify the permit.

In *Monsanto Co.*, the permit-holder argued in response to a summary judgment motion that because it had corresponded with the EPA requesting a permit modification, it could not be liable for a permit violation. The district court rejected such argument and stated that the permit requirements were not stayed pending a modification hearing.

In *Yates Industries,* the state agency verbally represented to the permit-holder that certain permit requirements would not be enforced. The district court concluded that such representations did not modify the permit.

requirement;[34] or (3) where the state agency or the EPA stayed a permit requirement pursuant to

a stipulation.[35]   The Sierra Club correctly observes that in each case, the purported modifications

to the permit, by agency letter, agency order, or stipulation, were deemed void because they were

not made pursuant to applicable regulations.   *See* 40 C.F.R. §§ 122.62, 122.63, 122.64, 124.5.

However, none of these opinions address the unique situation presented here.  The stay of

---

[34] In *Citizens for a Better Environment-California*, the state agency responsible for issuing permits issued an administrative order effectively, but not explicitly, amending the permit limits, making them less stringent.  The permit-holder moved to dismiss, arguing that there could be no permit violation given the agency's order.  The Ninth Circuit ruled that the administrative order did not have the effect of modifying the permit and instead simply evidenced the agency's intentions regarding its exercise of prosecutorial discretion.  It noted that there could be no modification to the permit absent compliance with state and federal regulations governing permit modifications.

In *Smithfield Foods,* the permit-holder argued, *inter alia,* that it could not be liable for an alleged violation of the effluent limit for phosphorous because a state agency had issued an administrative order allowing it to delay compliance with such limit.  However, the administrative order expressly stated that it did not alter the terms of the permit.  The district court granted summary judgment in favor of the United States on liability, and the appellate court affirmed.  Both concluded that the agency's order did not modify the permit limit and that the permit-holder was required to comply with it.

In *P. H. Glatfelter Co.,* a state agency issued a consent adjudication which set forth effluent limits different than those in an NPDES permit.  The district court ruled that the permit could not be amended by a consent adjudication and that the permit limits applied.  There was no state court action regarding the consent adjudication.

In *Culbertson*, a state agency issued a series of administrative orders which delayed the deadline for compliance with the permit's copper and zinc limitations.  As to one of the administrative orders, the state agency sought and obtained a judgment from the state court, although the legal basis for the judgment is not stated.  The district court ruled that the administrative orders did not modify the permit and instead constituted an expression by the state agency as to how it intended to exercise its prosecutorial discretion.

[35] In *New Jersey Expressway Authority*, the state agency brought an enforcement action against the permit-holder.  In connection with that action, the agency and the permit-holder entered into an enforcement agreement which, *inter alia,* relaxed the permit's effluent limitations.  However, the agreement specifically stated that it did not modify the permit's provisions.  The district court concluded that the agreement did not modify the permit.

In *Proffitt*, the permit-holder filed a motion for summary judgment, arguing that it could not be liable because the EPA had stayed the permit limits for TSS and pH pursuant to a stipulation which had been incorporated into an amended permit.  The district court granted summary judgment in favor of the permit-holder, and the Third Circuit reversed.  It concluded that the EPA's stay was ineffective because it contemplated the commencement of an action in "an appropriate state forum."  The permit-holder had commenced an action in a state forum, but it had abandoned such action.  Therefore, the appellate court stated that "the reason for the stay evaporated."

the Arequa Gulch permit was made by court order pursuant to a statutory remedy and was

followed by a new permit issued in 2003.  The Teller County District Court's Stay Order stayed

the enforcement of the Arequa Gulch permit except as specifically provided therein by the

enforcing agency.  Whether the Sierra Club or other citizens can enforce the old permit

restrictions when the enforcement agencies could not do so appears to be the pertinent question.

The parties have presented no law that addresses this issue, and the Court has found none.[36]

The Court, however, does not need to resolve this interesting question.  Assuming that the

Stay Order is ineffective in changing the effluent limits, the Sierra Club has failed to prove specific

violations of the original permit or that they were ongoing.

The evidence establishes only violations of the limits set in the Stay Order – five cyanide

exceedances between September 1998 and August 1999.  Although the original Arequa Gulch

permit is in evidence, the Sierra Club has not identified any specific exceedances of the effluent

limits in such permit or the dates of such exceedances.  Although the WQCD made no formal

---

[36] The Court observes that, based on this record, it is unclear whether the 2003 permit was issued as part of the process anticipated by § 25-8-404(5), C.R.S., thereby effectuating the rights of citizen entities such as the Sierra Club.

Although not determinative with regard to this issue, the Court has previously observed in conjunction with its rulings (**#164, #220**) on the Defendants' summary judgment motions that under federal and state doctrines of *res judicata* and collateral estoppel, parties in privity can be bound by a court determination.  *See, e.g.*, *Nwosun v. General Mills Restaurants, Inc.,* 124 F.3d 1255, 1257 (10th Cir. 1997); *Continental Divide Ins. Co. v. Western Skies Management, Inc.,* 107 P.3d 1145, 1147 (Colo. App. 2004).  The concept of privity generally requires a substantial identity between the issues in controversy and a demonstration that the parties "are really and substantially in interest the same." *See U.S. v. Power Engineering Co.*, 303 F.3d 1232, 1240 (10th Cir. 2002).  Using this definition, citizens or citizen groups who seek to enforce permits which are also enforceable by a government agency could be said to be in privity with such agency and might be bound by judicial determinations such as the Stay Order.  But more persuasive to the Court is the provision of the Colorado statute which characterizes the order as a <u>stay</u>, subject to further administrative proceedings.  A stay is just that – a temporary abatement of the permit and a substitution of permit limits.  Indeed, although not applicable to the facts of this case, 40 C.F.R. § 124.16 recognizes that an NPDES permit can be stayed.

determination that an upset condition occurred in 1999, it declined to prosecute the 1999 exceedances based upon its view that they were caused by excessive rainfall. Shortly before the Sierra Club commenced this action, CC&V attempted to remediate the exceedances. It changed the slope of the road and installed experimental ponds to reduce toxicity, adjust pH levels, and reduce the presence of metal constituents in the water. These measures appear to have been successful. Thus, at the time the Sierra Club filed its Complaint in November 2000, there was no ongoing violation or any likelihood of a recurrence of intermittent or sporadic violations of any effluent limitations.

For the claimed exceedance of the WET limitations in the original Arequa Gulch permit at Arequa Gulch Outfall 001A during the 4th Quarter of 1996, the Court cannot determine whether there was a chronic lethality limitation in effect as of that time or whether the Teller County District Court's November 14, 1996 stay had any impact on the WET testing requirement. In addition, for the reasons stated with regard to the Carlton Tunnel permit, the Court further concludes that a single WET test failure does not establish an ongoing violation.

## D.  Non-Permit Discharges

The Clean Water Act also generally prohibits "discharge of any pollutant," which it defines as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see also* 40 C.F.R. § 122.2.[37]   The Sierra Club asserts five claims for discharge of

---

[37]  The statute's definition of pollutant actually lists pollutant types:

> The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and

(continued...)

pollutants without a permit.[38]  It particularly alleges that the Defendants discharged pollutants

without a permit at five locations:

> <      Near the Carlton Tunnel portal from the sediment ponds and/or the waste rock
>         dump into Fourmile Creek.

> <      From the Valley Leach Facility, underdrains, pumpback system,
>         sediment/treatment ponds, and/or Arequa Gulch Outfall 001A into Arequa
>         Gulch.[39]

> <      From the Roosevelt Tunnel portal into Cripple Creek.

> <      From the Moffat Tunnel Cribbing Wall into Cripple Creek.

_____

[37](...continued)
> agricultural waste discharged into water.  This term does not mean (A)
> "sewage from vessels or a discharge incidental to the normal operation of
> a vessel of the Armed Forces" within the meaning of section 1322 of this
> title; or (B) water, gas, or other material which is injected into a well to
> facilitate production of oil or gas, or water derived in association with oil
> or gas production and disposed of in a well, if the well used either to
> facilitate production or for disposal purposes is approved by authority of
> the State in which the well is located, and if such State determines that
> such injection or disposal will not result in the degradation of ground or
> surface water resources.

33 U.S.C. § 1362(6).  The Clean Water Act also recognizes a pollutant called a "toxic pollutant," which is
defined as:

> those pollutants, or combinations of pollutants, including disease-causing
> agents, which after discharge and upon exposure, ingestion, inhalation or
> assimilation into any organism, either directly from the environment or
> indirectly by ingestion through food chains, will, on the basis of
> information available to the Administrator, cause death, disease,
> behavioral abnormalities, cancer, genetic mutations, physiological
> malfunctions (including malfunctions in reproduction) or physical
> deformations, in such organisms or their offspring.

33 U.S.C. § 1362(13).  Applicable regulations list pH and TSS as "conventional pollutants," and zinc and
cadmium as toxic pollutants  *See* 40 C.F.R. §§ 401.15 & 401.16.

[38] Claims 1(a), 10, 11, 13 and 14.

[39] This claim is asserted in the alternative to two claimed violations of the Arequa Gulch permit.

<   From the Squaw Gulch Pond into Squaw Gulch.

Assuming a continuing violation, case law identifies five elements which a plaintiff must prove to

prevail on a non-permit claim: (1) a discharge (2) of a pollutant (3) into navigable waters

(4) from a point source (5) without a permit. *See Sierra Club v. El Paso Gold Mines, Inc.,* 421

F.3d 1133, 1142 (10th Cir. 2005), *cert. denied,* _ S. Ct. _, 2006 WL 219374 (Apr. 03, 2006)

(NO. 05-933); *see also United States v. Brittain*, 931 F.2d 1413, 1414-15 (10th Cir. 1991).[40]

The Defendants contend that the Sierra Club has not proved the first two elements with

regard to any of the non-permit claims. The Defendants have argued that in order for the Sierra

Club to establish a discharge of a pollutant, it is required to prove that a pollutant was added to

the water "from the outside world." Such language is derived from a series of cases involving the

flow of water through dams. *See, e.g., National Wildlife Federation v. Gorsuch*, 693 F.2d 156

(D.D.C. 1982); *National Wildlife Federation v. Consumers Power Co.*, 862 F.2d 580 (6th Cir.

1988). Both cases are distinguishable on their facts, but they are instructive. Such cases, and

others like them, focused on the source of pollutants in determining whether there was an

"addition" of pollutants to water. *See also Committee to Save Mokelumne River v. East Bay*

*Mun. Util. Dist.*, 13 F.3d 305 (9th Cir. 1993) (surface runoff from an abandoned mine was a

discharge requiring a permit); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New*

*York*, 273 F.3d 481 (2d Cir. 2001) (discharge permit required for transfer of polluted water from

one body of water into another body of water where it would not have flowed naturally);

---

[40] As to all five claims, elements 1 and 2 are factually disputed. The facts pertaining to element 3 are not disputed but the Defendants challenge this element as a matter of law. For the reasons articulated, it is not necessary to resolve any of the disputes as to element 3. The Defendants also contend that the Moffat Tunnel Cribbing Wall and Squaw Gulch Pond are not point sources for purposes of the Clean Water Act. It also is not necessary to resolve this contention.

*Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934 (7th Cir. 2004) (discharge permit required to drain a fish hatchery pond into a river); *United States v. Deaton*, 209 F.3d 331 (4th Cir. 2000) (discharge permit required because the digging of a ditch created a pollutant not previously present). If a rule can be discerned from these cases, it is this – a pollutant is added to water when its presence in the water is caused by human action and it did not otherwise naturally occur in the water to the same degree.

The Sierra Club repeatedly argues that it is not required to "prove the origin of the pollutants in order to establish liability." This argument begs the question. With regard to a non-permit claim, the Sierra Club must establish that there was a discharge of a pollutant into the water – the mere presence of identified chemicals in the water does not constitute a violation of the Clean Water Act because such chemicals could be there naturally. If water contains a substance in the same amount or degree as naturally occurs in the environment, then it is unlikely that anything has been added or discharged into the water. Sierra Club has presented no evidence as to whether, what or the degree to which the chemicals or other substances reported in test results are naturally found in the water at the subject locations. Thus, the Court has no evidence from which it can determine whether any pollutant has been added or discharged into the water. As a consequence, the Sierra Club has not proved that there has been a violation of the Clean Water Act.

In addition, with regard to the alleged non-permit discharges from the sediment ponds, Moffat Tunnel Cribbing Wall and Squaw Gulch Pond, the Sierra Club has not proved a hydrological connection between the observed water flows and the alleged point sources.

## IV.  Conclusion

The Mineral Policy Center lacks standing to pursue any claims, and the Sierra Club has failed to meet its burden of proof as to all claims.  As to the permit violation claims (Claims 2, 3, 4, 5, 6, 7, 8(a), 8(b), 9 and 12), the Sierra Club has failed to establish ongoing violations.  As to the non-permit claims (Claims 1(a), 1(b), 10, 11, 13 and 14), the Sierra Club has failed to establish that there were discharges of pollutants at any of the locations and as to Claims 1(a), 13 and 14, that the discharge was from a point source.

**IT IS THEREFORE ORDERED** that:

(1)     The Mineral Policy Center's claims are dismissed for lack of standing.

(2)     Judgment shall enter in favor of the Defendants and against the Sierra Club as to all claims asserted in this consolidated action.

(3)     In accordance with Fed. R. Civ. P. 54(d) and 33 U.S.C. § 1365(d), the Defendants may apply for an award of attorney fees and costs within 14 days after entry of judgment.

Dated this 13th day of April, 2006

**BY THE COURT:**

Marcia S. Krieger
United States District Judge